Filed 3/30/21  In re Michael S. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MICHAEL S., et al., Persons Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHELLE G. et al.,<br><br>        Defendants and Appellants. | A158215, A158844, A159775<br><br>(Sonoma County<br>Super. Ct. Nos. 5347DEP,<br>5752DEP, 5753DEP) |

These multiple consolidated dependency appeals by two parents and one paternal aunt concern three young siblings each detained at birth due to their parents' chronic drug abuse and who have spent their entire lives in foster care:  three-year-old Michael, who tested positive at birth for methamphetamine, and his younger sisters, two-year-old twins, R.A. and R.J., who also were exposed to drugs in utero, and were born three weeks prematurely a day after their mother tested positive for methamphetamine.

In Michael's case, mother received only six months of reunification services and father, twelve.  Subsequently, reunification services were bypassed for the twins because of their parents' failure to reunify with

1

Michael. After that, the juvenile court summarily denied father's Welfare and Institutions Code section 388[1] petition seeking additional reunification services and related relief on the basis of changed circumstances. Following a five-day evidentiary hearing, it also declined to remove the children from their foster homes and place them with father's sister, appellant Tracie G. (Aunt Tracie), who had been requesting placement of the children since the beginning of their cases and eventually sold her home and moved from across the country to southern California. Then, when a previously undisclosed conflict of interest on the part of the children's lawyer came to light at the conclusion of the contested relative placement hearing, it disqualified the conflicted attorney and appointed new, unconflicted counsel for the children but declined, in addition, to declare a mistrial at the parents' and aunt's request—relief that the children's new lawyer opposed. The juvenile court then terminated parental rights and designated the children's two foster families as prospective adoptive placements.

On appeal, the parents and Aunt Tracie challenge multiple rulings. But for a conceded Indian Child Welfare Act (ICWA) error that requires a limited remand, we affirm the juvenile court's rulings.

## BACKGROUND

### A. Initiation of Proceedings and the Reunification Period

Three-year-old Michael's dependency case began on December 12, 2017, two days after he and his mother tested positive for methamphetamine at his birth, when a protective custody warrant issued before his release from the hospital, while he was still suffering from symptoms of withdrawal. Delivered service logs reflect that a social worker from the Sonoma County

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Human Services Department (agency), William Begley, met with the parents that day at the hospital, and father informed him of a large support system of family members, including his sisters and mother on the east coast.

The agency filed a juvenile dependency petition the following day, December 13, and the next day, December 14, the juvenile court ordered Michael detained. Upon his release from the hospital, Michael was placed into an emergency foster home.

The original petition alleged only mother had a chronic substance abuse problem that placed the child at risk; it was soon amended to allege father did too, which was reflected in his lengthy criminal record of drug-related charges (some violent), and also that he knew about mother's drug use and was unable to protect the baby from her.

In its report prepared for the detention hearing, the agency reported that "[n]o relative has been identified for placement."

Father did not appear at the detention hearing but, unbeknownst to the court, one of father's sisters, Michelle, who lived in Massachusetts, had flown to California and attended the hearing, hoping to take temporary and permanent custody of the child. She spoke up at the hearing, without identifying herself, to clarify a question about father's possible Indian heritage. No objections or issues were raised at the detention hearing concerning the subject of a potential relative placement.[2] After the detention hearing, Michelle met with the social worker, was informed she could not take custody of the baby because the case would be in reunification, and provided the social worker with contact information for other paternal relatives, including Aunt Tracie.

---

[2] At that juncture, only mother had been named in the petition and was the only parent represented by counsel at the detention hearing.

It is undisputed, and the juvenile court would much later find, that the agency failed thereafter to give any notice of Michael's case to father's known relatives and their rights to participate in it, notice that is statutorily required within 30 days of a child's removal from parental custody.[3]  One of

---

[3]  Subdivision (e)(1) of section 309 states in relevant part:

"If the child is removed, the social worker shall conduct, within 30 days, an investigation in order to identify and locate all grandparents, . . . [and] other adult relatives of the child, as defined in paragraph (2) of subdivision (f) of Section 319, including any other adult relatives suggested by the parents . . . .  The social worker shall provide to all adult relatives who are located, except when that relative's history of family or domestic violence makes notification inappropriate, within 30 days of removal of the child, written notification and shall also, whenever appropriate, provide oral notification, in person or by telephone, of all the following information:

"(A)  The child has been removed from the custody of his or her parent or parents, guardian or guardians, or Indian custodian.

"(B)  An explanation of the various options to participate in the care and placement of the child and support for the child's family, including any options that may be lost by failing to respond.  The notice shall provide information about providing care for the child while the family receives reunification services with the goal of returning the child to the parent or guardian, how to become a resource family, and additional services and support that are available in out-of-home placements, and, if it is known or there is reason to know the child is an Indian child, the option of obtaining approval for placement through the tribe's license or approval procedure.  The notice shall also include information regarding the Kin-GAP Program (Article 4.5 (commencing with Section 11360) of Chapter 2 of Part 3 of Division 9), the CalWORKs program for approved relative caregivers (Chapter 2 (commencing with Section 11200) of Part 3 of Division 9), adoption, and adoption assistance (Chapter 2.1 (commencing with Section 16115) of Part 4 of Division 9), as well as other options for contact with the child, including, but not limited to, visitation.  The State Department Of Social Services, in consultation with the County Welfare Directors Association of California and other interested stakeholders, shall develop the written notice."

4

them was father's sister Aunt Tracie, who lived in Georgia and who, according to delivered service logs, had called and spoken with the social worker about offering assistance to the family the same day the social worker met with the parents in the hospital (December 12, 2017).

Both parents refused to meet with the social worker who prepared the report for the combined jurisdiction/disposition hearing. The report stated that, "at this time no relative placement has been identified. There are relatives in Washington, Massachusetts, Georgia, and Southern California. The Placement Specialist is in the process of evaluating these."

The jurisdiction/disposition report contained details of father's life-long struggle with drugs, including chronic methamphetamine abuse since age 13. It also reported on his lengthy criminal record, with voluminous attachments detailing a history of criminal arrests and convictions dating back to his youth. Many were drug-related. Some were disturbingly violent. At the time of its writing, father was on probation for drug-related charges, and an arrest warrant was outstanding on him for violating the terms of his probation.

On January 10, 2018, one month after Michael was born, father was arrested and taken into custody where he would remain for several months. His arrest also marked the beginning of a lengthy period of sobriety for him.

---

The statute also requires the social worker to use "due diligence" to investigate the names and locations of all such relatives (§ 309, subd. (e)(3)), and to provide to all adult relatives who are notified a relative information form, developed and approved by the Judicial Council, enabling the relative "to provide information to the social worker and the court regarding the needs of the child" and to "request the permission of the court to address the court, if the relative so chooses." (*Id.*, subd. (e)(2).)

Thereafter, at the combined jurisdiction/disposition hearing, the parents submitted on the allegations of the amended petition, the juvenile court sustained the allegations, declared Michael a dependent of the court, and ordered reunification services pursuant to a negotiated disposition reached during a settlement conference.[4] At this point, father was in custody. His counsel reported father was planning to enroll in a nine-month rehabilitation program (Turning Point). Pursuant to the negotiated disposition, the court made a finding on February 1 that, "The Department has made diligent efforts to identify, locate and contact the child's adult relatives within the fifth degree and, for those who are appropriate, has informed them of their options to participate in the care and placement of the child."

On March 3, 2018, Michael was moved from emergency foster care to a foster family that wanted to pursue adoption (commonly referred to as a "concurrent planning home"), where he remained for the duration of the case.

The agency filed three status review reports after the combined jurisdiction/disposition hearing (for a three-month review hearing, the six-month review hearing and again for a 12-month review hearing for father), and none mentioned anything about efforts to assess relatives for placement. The reports did, however, report on concurrent planning. In the six-month report (filed July 5, 2018), the agency reported that Michael "was presented at a Concurrent Planning Meeting on June 26, 2018 and was not accepted

_____

[4] There is some lack of clarity as to the precise date reunification services commenced. The combined jurisdiction/disposition hearing commenced on January 11, 2018, but was continued to facilitate a settlement conference. At the continued hearing on February 1, 2018, the juvenile court adopted the proposed disposition resulting from the settlement discussions, and ordered reunification services. Later status reports, however, reflect that reunification services were ordered on January 11.

due to prognosis for reunification," but that he "will be reassessed for concurrent planning prior to the twelve-month review hearing." The 12-month report (filed December 26, 2018) reported on his continued placement in a concurrent planning home, since March 3. No objections or issues were raised at the review hearings concerning the subjects of a potential relative placement, the lack of information in the reports about the agency's efforts to investigate relatives, or Michael's continued placement in a concurrent planning home.

On March 29, father was released from jail and, as a condition of probation, entered a nine-month residential drug treatment program, Turning Point, with an expected completion date of December 29.

Meanwhile, efforts were underway to assess Aunt Tracie as a potential placement, having begun when Michael was less than a month old. In late December 2017 or early January 2018, the social worker in charge of assessing relatives for an initial potential placement (Ann Grubaugh) screened Aunt Tracie by phone, and then on January 11, 2018, initiated a request pursuant to the Interstate Compact on Placement of Children (ICPC) (Fam. Code, § 7900 et seq.) to have her home in Georgia assessed; Grubaugh informed the primary social worker on the case (Mary DiGiacomo) that this was underway.

Grubaugh testified her only concern at that point about placing Michael with Aunt Tracie was that Aunt Tracie lived out of state which would be an obstacle to reunification. In an email to DiGiacomo reporting on the telephone screen, she also noted a concern that Aunt Tracie was "defensive of/possibly unrealistic about the baby's father and reunification." Her email reported that she told Aunt Tracie that, "I am doing an ICPC, but told her we will likely need to move the baby by February—possibly to step-

7

aunt Wendy or to another foster home. I explained that if she is the concurrent plan we would want her to come out here and have contact with the baby and the foster family."

Aunt Tracie testified Grubaugh told her she could not be considered for immediate placement because the case was in reunification, but that if reunification failed she would be "plan b" as the permanency option. Grubaugh testified that the *family* had selected Aunt Tracie as "Plan B" among all the relatives if reunification failed, as reflected in her contemporaneous email to DiGiacomo ("She says she is in conversation with the [paternal grandmother], and the other paternal aunts (in Massachusetts) and she is the agreed upon Plan B for Michael").

They spoke again in March or April, when Grubaugh explained the importance of bonding with the child, and Aunt Tracie told Grubaugh she was planning to move to California.[5] Grubaugh testified she told Aunt Tracie there was little point in completing the ICPC process if she was moving, and that she would need to have her new home in California approved through the Resource Family Approval (RFA) process. Grubaugh didn't explain how the RFA process worked, though, because she didn't know when Aunt Tracie planned to move or which county she would be moving to, and Grubaugh was transitioning off the case. Grubaugh's role in the case ended sometime around this time, in March or April, after she'd initiated the ICPC. On April 8, Georgia authorities reported to the agency that Aunt Tracie had decided not to move forward with the ICPC process, because she was

---

[5] Aunt Tracie testified she offered to move to California in order to facilitate bonding with Michael. Grubaugh didn't remember her saying that, only that she was moving to California because her daughter was in school there and asking whether she should complete the ICPC process.

8

planning to move to California in the next few weeks and did not want to begin the home approval process in Georgia.

In May 2018, when Michael was about four months old, Aunt Tracie closed on the sale of her Georgia home, traveled to Sonoma County for several weeks to visit with him as much as she could and moved to Long Beach, California. She tried three or four times to contact Grubaugh as soon as she arrived in California, but her messages went unreturned and she was never informed that Grubaugh was no longer on the case.

Several months later, on September 11, 2018, mother's reunification services were terminated after a contested six-month review hearing.

Father, who had consistently been testing negative for drugs while in his rehabilitation program, received an additional six months of reunification services. But a short time later, he was placed on a "behavior contract" in Turning Point, and a month later, on November 10, he was discharged from the rehabilitation program because he was dishonest about his whereabouts one day.[6] An arrest warrant then issued for him because his discharge constituted a violation of his probation. After his discharge from Turning Point, he entered a transitional housing program (Interfaith Shelter Network), but after about three weeks got discharged from that program too because, in violation of its rules, he wasn't actually living there.[7] By that time, he had resumed a relationship with mother, who was now pregnant

---

[6] According to his later testimony, he reported being at work one day when in fact he attended an emergency medical appointment with mother, who was then pregnant with twins. He knew it violated the rules to skip work without telling the program staff.

[7] Father later testified the reason he stopped staying there was because he knew about his outstanding arrest warrant, and didn't want to cause a "scene" at his transitional house.

with the twins and whom the agency suspected of continuing to abuse drugs, and the two were living together.[8] Although father denied suspecting mother of continued drug abuse at this juncture, the agency believed he suspected mother of continuing to abuse drugs and he had even expressed a desire to get her into a drug rehabilitation program. Father himself tested negative for drugs for the agency on November 20 but then missed two drug tests in December 2018.[9]

Father knew his expulsion from the Turning Point program was a probation violation and learned of the arrest warrant but did not turn himself in or contact his probation officer. Nor did he inform the agency he'd been discharged from Turning Point or that he had an outstanding arrest warrant.[10] On December 19, more than a month after his expulsion from the program, he was arrested on the probation violation during a routine traffic stop and taken into custody.

The twins were born the following month, on January 10, 2019, while father was in jail on the probation violation. The agency obtained a protective custody warrant for them the day after their birth, a dependency

---

[8] Mother later tested positive for methamphetamine in January, February and March of the following year.

[9] He later testified he missed the two drug tests because he had just started a new job, was asked to work those days and needed the money. He told the agency he missed one of the tests because he was upset at the recommendation to terminate his reunification services.

[10] His social worker found out about the discharge through other means, and when she asked him how it would affect his criminal case, he downplayed it, telling her he hadn't heard from his probation officer and, "I should be fine." When she found out about his arrest warrant and asked him about that, he told her he didn't want to turn himself in yet because he wanted more visits with Michael and to put "things in place" so that he presented a more favorable case to the judge.

petition was filed on January 15, 2019, and they were placed into foster care with a couple who wished to adopt them. At the detention hearing held on January 16, the juvenile court asked whether any relatives were available to care for the infants, and father's counsel said no. The children were ordered detained, and the court ordered paternity testing for father.[11] Once again, neither parent raised any issue regarding the agency's effort to assess potential relatives for placement.

About a month later, on February 11, 2019, father's reunification services were terminated in Michael's case after a contested hearing, while he was still in jail and awaiting sentencing on the probation violation.[12] Despite father's claim to 13 months of sobriety, the juvenile court did not believe father would be able to successfully reunify with Michael in the next several months particularly given the uncertainty as to whether his probation violation would result in a lengthy period of incarceration. A section 366.26 hearing was scheduled, and later continued to July 31, 2019.

The twins' cases soon proceeded to the permanency planning phase as well.

At a contested jurisdiction/disposition hearing held on March 22, 2019, the petition in their case was sustained, the juvenile court declared the twins dependents, ordered them removed from parental custody and bypassed both parents for reunification services under section 361.5, subdivision (b),

---

[11] The agency received paternity test results confirming father's paternity in early March, when the twins were around two months old.

[12] At that juncture, he expected to return to criminal court on February 19 and planned to ask to be placed into an 18-month residential treatment program that allows children (Crossing the Jordan).

because they had failed to reunify with Michael.[13] A section 366.26 was scheduled and later continued to coincide with Michael's section 366.26 hearing. Father, who was still incarcerated, was deemed a presumed father. He testified he was still clean and sober, was participating in a 12-step program in which he was at step three, and he was to return to criminal court on April 10.[14] He planned to request that upon his release from custody his probation be transferred to Southern California, where Aunt Tracie lived.

On April 5, 2019, the agency interviewed Aunt Tracie at its offices in Santa Rosa, California for possible placement of the children. Aunt Tracie met the twins for the first time on that occasion and visited with them for about an hour. The following month, at the end of May 2019, the agency filed two memos with the court recommending the court rule out a relative placement with her.

On April 16, after reunification services had been terminated in Michael's case and bypassed in the twins' case, Aunt Tracie filed a section 388 petition requesting placement of the twins with her, which was denied without prejudice on May 8, 2019, because her home had not received RFA approval. Aunt Tracie reported encountering repeated bureaucratic obstacles to completing the RFA, including that Sonoma County was declining to send the appropriate paperwork to Los Angeles County. The court indicated the minute order should reflect that the court wanted Los Angeles County to complete the RFA.

---

[13] Initially the agency had recommended reunification services for father if he was found to be the presumed father, but changed its recommendation to bypass in an addendum report filed March 13, 2019, after reunification with Michael failed.

[14] Mother failed drug tests in February and March, testing positive for methamphetamine and marijuana.

Thereafter, on May 9, 2019, she renewed her request for placement of the children in a second section 388 petition, which culminated in rulings challenged here on appeal.

Meanwhile, on April 10, father had been released from custody. Two months later, on June 26, 2019, he filed two identical section 388 petitions (one for Michael, one for the twins) asking the court to (1) vacate the section 366.26 hearing, (2) return the children to his custody or place them with his relatives and order additional reunification services, or (3) place them permanently with his relatives. The juvenile court denied the requests without an evidentiary hearing on July 3, 2019, on the grounds both that they did not allege new facts or a change in circumstances and also did not allege a change in order was in the children's best interests. Father has appealed its summary denial.

The juvenile court then calendared Aunt Tracie's section 388 petition for a contested hearing, combined with a hearing on the agency's request to rule out relatives for placement, and received voluminous trial briefs and other submissions on the question of relative placement.

## B. The Combined Relative Placement and Section 366.26 Hearings

The matters proceeded to a contested five-day evidentiary hearing, commencing on July 22, 2019, and concluding with arguments on August 28, 2019. The parties have accurately summarized the testimony in their appellate briefs, some of which we have already referenced and which will be discussed further below as necessary.

During the contested hearing, there were indications father had relapsed into substance abuse. Mother and father were absent from court one day and hours late the next day, both times claiming to be sick. The juvenile court also observed father had lost a great deal of weight, expressed

13

concerned he was again using drugs and ordered drug testing of both parents. Eventually, at the time the court announced its decision, drug test results were received confirming their suspected methamphetamine use.

On September 10, 2019, in a lengthy oral ruling discussed further below, supported by extensive discussion of the caselaw, the juvenile court denied Aunt Tracie's petition. The juvenile court stated that it was applying the statutory relative placement factors of section 361.3 and "not just the section 388 analysis of what's in the best interest of the child." It found the agency had not given the relatives proper notice of their rights to participate in the case and to be considered for placement. However, in denying Aunt Tracie's request, it expressed concerns about disrupting the children's bonds with their current caregivers, which in the twins' case related to their medical needs. It also concluded there was a substantial risk that father, who had relapsed again on methamphetamine, would try to maintain contact with his children wherever they were placed, and that Aunt Tracie would likely not be able to resist his pressure given her previously expressed attitudes about him.

Mother, father and Aunt Tracie filed timely appeals from the court's decision.

### C.     The Conflict of Interest, Requests for a Mistrial and the Appointment of New Counsel for the Minors

After the court delivered its oral ruling on Aunt Tracie's request for placement on September 10, 2019, but before it ruled on the section 366.26 portion of the hearing, Aunt Tracie's counsel brought to the court's attention (first, in chambers and then on the record in open court) she had discovered that counsel for the children, Monica Julian, had been gifted a home by Michael's foster parents during the case, in violation of the rules of professional conduct.

14

This precipitated an on-the-record disclosure of the facts by Julian, who asserted there was no conflict of interest. Julian explained she had lost her home in the wildfires of October 2017, several months before she was appointed to represent Michael (in December 2017). She was "very connected" with the local foster community, active in recovery efforts for the fire, and some people knew she had lost her home. In December 2018, about a year after she began representing Michael and while living in a short-term rental, another foster parent approached her and told her that Michael's foster father was building a tiny home ("basically, a trailer") and was looking for someone displaced by the fires to give it to. She consulted with her supervisor and they agreed it didn't warrant appointing new counsel, and Julian didn't think it would or did affect her professional representation of any of the children.

The juvenile court refrained from issuing a ruling on the section 366.26 portion of the hearing, and continued the case so the conflict of interest issue could be investigated and more fully considered.

Subsequently, both parents and Aunt Tracie asked the juvenile court to disqualify Julian, appoint new independent counsel and declare a mistrial of varying scope.[15] The agency subsequently reported that one of the social workers had been aware Michael's foster father was building a house for Julian and had consulted with a deputy county counsel who relied on the assessment of the children's counsel that it posed no conflict. For that

---

[15] Mother asked for a new trial of the relative placement issue on various statutory grounds (§ 388; Code Civ. Proc., § 657, subds. (1), (3)), declaration of a mistrial in the still-pending section 366.26 hearing, and rehearing pursuant to section 388 of all rulings in the case since February 2018, including the bypass of reunification services in the twins' case. Father asked for a "retrial on all issues before the Court." Aunt Tracie asked for a mistrial in the relative placement hearing.

reason, the information was not put into the case file or passed along to other attorneys who later worked on the case, including the trial attorneys. The agency also recommended Julian be relieved and new counsel be appointed for the children and charged with undertaking an independent assessment as to whether any further steps were necessary. At the next hearing, Julian continued to deny there was any ethical violation (and provided additional details about the alleged conflict), but was willing to declare a conflict and did so. The juvenile court "accepted" her declaration of a conflict, noting there was at least an "appearance" of a conflict, ordered her relieved, and subsequently appointed attorney Amy Rodney both to represent the children and to review the history of the proceedings, investigate and evaluate whether Julian's conflict tainted any decisions in the case, and report back.

Attorney Rodney then studied the entire court file; reviewed all transcripts of the relative placement hearing and section 366.26 hearing; spoke with attorney Julian, social worker Bernal and counsel for all of the other parties (including Aunt Tracie's counsel); met with Aunt Tracie and the children's foster parents; observed a visit between Aunt Tracie and the children; and filed two written reports. She concluded Julian had a conflict of interest that should have been disclosed in March 2018 when Michael was placed with his foster parents, even though Julian did not receive the home until later, because by that point Julian was already under consideration as the recipient. However, she concluded the conflict had no impact on either parent. It did not impact the termination of reunification services in Michael's case, nor the bypass of mother's reunification services in the twins' case, and any potential impact on father's bypass of services was harmless given his relapse into drug use in the midst of the contested placement hearing. She attributed the outcome of their cases entirely to their own

16

failures to follow through on their case plans and inability to overcome their substance abuse addictions. She thus concluded that, as to the parents' interests, no further action beyond the appointment of new minors' counsel was necessary.

She concluded Julian's conflict might have impacted the issue of relative placement but could not definitely say,[16] and suggested the court had the option either of declaring a mistrial and re-doing the entire trial, or simply reopening the hearing to allow minor's counsel to take a position on the issues and, if desired, present new evidence. As counsel for the minors,

---

[16] Given the goal of reunification in Michael's case, Rodney concluded that a reasonable minor's counsel might have interviewed Aunt Tracie as a possible placement only *after* father's reunification services were terminated in February 2019. Earlier in the case, she concluded, it "may have been entirely appropriate" for Julian to have refrained from conducting an independent assessment of relatives and to have relied on the agency's efforts to locate and evaluate relatives.

She concluded the impact of Julian's conflict on the twins' placement was even "more attenuated," because their foster parents were not the source of the conflict. However, she concluded that "there is some reason to question what effect there would be on Michael if his siblings were placed with a relative 500 miles away and that question could have impacted [Julian's] position with respect to the [twins' placement]."

Ultimately, though, "[w]hether reasonable minor's counsel could have supported placement for Michael or the twins with [Aunt Tracie] at any point in the process cannot be determined."

She also concluded the conflict "may have" impacted the hearing on the relative placement issue. She noted the juvenile court made clear it was making its own independent assessment based on the evidence and court record, and also made clear after the conflict was disclosed that the court had not relied on the positions taken by Ms. Julian in reaching its decision. "However, might there have been some additional or different information presented by minor's counsel? It seems unlikely since [Aunt Tracie] was represented by competent counsel. But it is possible."

17

she advocated terminating parental rights, did not recommend a mistrial, and said that if the hearing were reopened she would present no new evidence and would advocate in favor of letting the court's decision on relative placement stand. She also noted that if the court declared a mistrial then she might seek to introduce new evidence.

On February 24, 2020, after hearing extensive argument, the juvenile court denied the motions for a mistrial. It then reaffirmed in some detail its prior decision on relative placement, made findings pursuant to section 366.26 and terminated parental rights. Mother, father and Aunt Tracie timely appealed the court's rulings of that date.

## DISCUSSION

We address the issues raised on appeal principally in the chronological sequence they arose below.

## I.

### *The Trial Court Did Not Err in Summarily Denying Father's Section 388 Petitions Without a Hearing.*

The first claim of error, as noted, is father's appeal from the juvenile court's July 3, 2019 summary denial of the petitions he filed on June 26, 2019, on the basis of changed circumstances, seeking either the return of his children under a plan of family maintenance and/or reunification services.[17]

---

[17] The petitions also requested, in the alternative, placement of the children with Aunt Tracie, but father tells us his appellate arguments do not concern that aspect of his petitions. We address the placement issue separately below, in connection with the denial of Aunt Tracie's section 388 petition.

Father also does not challenge the juvenile court's summary denial of a second set of substantially identical section 388 petitions he filed later, on August 26, 2019, in the midst of the ongoing placement hearing, which he states "are not a part of this appeal."

18

He contends the court denied him due process by denying him an evidentiary hearing, because his petition stated a prima facie case of changed circumstances and that his children's best interests may be promoted by his requested relief.

We conclude there was no error.

### A. Father's Allegations

Father supported his petitions with a verified declaration, the contents of which we quote in full:

"My circumstances have substantially changed since the court terminated my services for Michael, and bypassed me for services for [the twins] and set .26 hearings. After those hearings on April 10, 2019, I was released from custody. Upon my release I immediately requested visitation with my children, enrolled in substance abuse treatment, with DAAC, and continued taking parenting classes. After being released from DAAC in May, I enrolled in a relapse prevention class, which I have since completed. I have completed an anger management class, and am being provided with DV classes. I have completed three parenting classes, including a general class, a class for children 0–5 years old, and a trauma informed care class. I have signed up with City Dad's Club in LA, which offers parent child classes, field trips, and events specifically for fathers. I have also applied to East Los Angeles Community College and intend to complete the Drug Counselor Certificate courses while also working.

"4. I have been clean and sober since January 10, 2018.

"5. I have been released from DAAC. I speak with my sponsor, Brandan Stegner, on nearly a daily basis. I have completed the 12-step program.

19

"6. Since becoming sober, I have increasingly reconnected with my sober and stable family members. They are supportive of me, and my children. Multiple of my relatives, including my sister Tracie [surname omitted], my sister Michelle [surname omitted], my sister Jessica [surname omitted], my sister Courtney [surname omitted], my sister Amanda [surname omitted], and mother Lisa [surname omitted].

"7. My family have consistently requested that my children be placed with them. They first started making requests when little Mikey was taken into foster care. I tried to create a guardianship for Mikey with my sister Michelle who flew to California for this purpose but was told she lived too far away. Since then all of my sisters have asked for placement of my children, on either a temporary or permanent basis.

"8. I recently spent a week with my sister and her daughter in their home in Long Beach. My sisters Michelle, Jessica, and my nephew Alex were there as well. I took the opportunity to seek out services which could be in place if my children were placed with family and the dependency case transferred. Project Fatherhood provides parenting classes and resources for fathers with dependency cases.

"9. I believe it would be best for the children to be with family, particularly my sister Tracie. It is always best for children to be with family if possible. Tracie is stable, successful, and protective: she graduated high school when she was sixteen and started college as a teenager, she is a certified public accountant, and she has experience raising children. Tracie raised her adult daughter who went through private schooling and is [a] successful bright young adult who has never been in any trouble. If my children were placed with Tracie, they would have the benefit of Tracie

20

raising them; and having relationships with their cousins, aunts, grandma, as well as their half-siblings and me.

"10.  I am on probation until August 6, 2021.  I am in compliance with all of my probation requirements.  I have successfully transferred my probation to Los Angeles county.  I have moved into a Sober Living Home, Victory House, in West Los Angeles, on a month to month basis so that I am able to move to an independent living situation if my children are returned to me.

"11.  Regardless of where I live, I plan to get a stable job, support myself and my children, have relationships with my children, and hopefully have them in my custody.

"12.  I believe it would be best for my children to be in my care because they deserve to be with me, their family.  I have visited my children regularly.  I have worked hard to change my life, to establish and maintain my sobriety, to reconnect with my family members, and to be the best father I can be.  My children deserve the benefit of a parent who has fought tirelessly for them.  I believe my experiences would enrich their lives."

Attached to father's petitions were copies of documents attesting to father's completion of various classes, as well as two letters of support.

The juvenile court summarily denied father's petitions on the grounds that they did not allege new facts or a change in circumstances nor did they allege a change in order was in the children's best interests.  The agency argues we may affirm on either ground.  We reach only one.

**B.    Legal Principles**

" 'After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point, "the focus shifts to the needs of the child for

21

permanency and stability" [citation], and in fact, there is a rebuttable presumption [pending the adoption of a permanent plan] that continued foster care is in the best interests of the child.' (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [*Stephanie M.*].) After the focus has shifted from reunification, '[t]he burden . . . is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue.' (*In re Marilyn H.* [(1993) 5 Cal.4th 295,] 309.) This scheme 'provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of his custody status.' " (*In re C.W.* (2019) 33 Cal.App.5th 835, 839.)

Section 388 authorizes a parent to petition the juvenile court to change, modify or set aside a prior order "upon grounds of change of circumstance or new evidence" (§ 388, subd. (a)(1)), and requires the juvenile court to order a hearing on such a petition "[i]f it appears that the best interests of the child . . . may be promoted by the proposed change of order." (§ 388, subd. (d).) To secure a hearing, "the parent must sufficiently allege *both* a change in circumstances or new evidence *and* the promotion of the child's best interests. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 808 (*Zachary G.*).) [¶] A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause. [Citations.] It is not made, however, if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing. [Citations.] While the petition must be liberally construed in favor of its sufficiency [citations], the allegations must nonetheless describe specifically how the petition will advance the child's best interests." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157.) Whether a prima facie showing has been made entitling a parent to a hearing "depends on the facts alleged in [the] petition, as well as the facts

established as without dispute by the court's own file." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461.) " '[I]f the petition presents any evidence that a hearing would promote the best interests of the child, the court will order the hearing.' " (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.)

Father argues we must review the juvenile court's ruling de novo. And, despite the many cases saying we must review this issue for an abuse of discretion (collected primarily in the respondent's brief), he cites language in one appellate decision arguably supporting that proposition. (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1416-1417.) We will not delve into the authorities, however, or attempt to reconcile them, because whether reviewing the juvenile court's ruling de novo or for an abuse of discretion we conclude there was no error.

### C. Analysis

It is unnecessary to address whether father sufficiently alleged a change in circumstances, because his petition failed to make a prima facie showing that a change in orders was in his children's best interests.[18]

Father's only allegations concerning this subject were in paragraph 12 of his supporting declaration which, as noted, alleged the following: "I believe

---

[18] At least in one respect, father arguably did allege a change of circumstance: namely, after reunification services were terminated in Michael's case and bypassed in the twins' case, he was released from custody. However, father hasn't argued that such a change alone suffices, nor supported such an argument with pertinent legal authority. A more complicated question is presented as to whether the steps he allegedly took toward achieving sobriety for roughly 18 months constituted a prima facie showing of changed circumstances (much of which period he spent in either the confines of jail or the structured environment of a residential treatment program). We do not reach that question. (Compare, e.g., *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432 [prima facie showing made where, inter alia, mother tested clean in weekly random drug tests for over two years] with *In*

it would be best for my children to be in my care because they deserve to be with me, their family.  I have visited my children regularly.  I have worked hard to change my life, to establish and maintain my sobriety, to reconnect with my family members, and to be the best father I can be.  My children deserve the benefit of a parent who has fought tirelessly for them.  I believe my experiences would enrich their lives."

Citing *In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*), Father asserts these allegations constitute a prima facie showing on the best interest issue.  *Kimberly F.* did not address the prima facie requirements of section 388, however, and is distinguishable.  It reversed the denial of a section 388 petition after a full evidentiary hearing, and under very different circumstances which the appellate court described as the "rare" situation that warrants reversal.[19]  (*Kimberly F.,* at p. 522.)  Father's conclusory allegations, which for the most part focused not on his children but himself, do not plead *facts* showing that the best interests of his children could be promoted by offering him additional reunification services.  (See *In re Daijah T.* (2000) 83 Cal.App.4th 666, 671-672; see also *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250 (*Anthony W.*) ["The petition may not be conclusory"].)

Father also contends a change was in the children's best interests because the record shows that he visited them as often as possible under the circumstances (i.e., his repeated periods of incarceration), his visits with

_____

re *Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [seven months' sobriety held insufficient given extensive history of drug abuse].)

[19]  The reason for the dependency in that case, unsanitary conditions, was not nearly as serious as the parental drug abuse here, the problem had been totally resolved and, unlike here, the children were more strongly bonded to their mother than to their current caretakers.  (*Kimberly F., supra,* 56 Cal.App.4th at p. 522.)

them were positive, he demonstrated good parenting practices, and exhibited love and affection toward them. We do not doubt father's love for his children (a fact that is evident throughout this record), nor his desire to try to make hard, lasting changes that could enable him to safely parent a child, nor the efforts he made to bring those changes about. But at this stage of proceedings in his children's dependency cases, allegations of positive visits alone do not warrant an evidentiary hearing on a request to reopen reunification. They simply do not constitute a prima facie showing that the best interests of his young children could be promoted by resuming reunification services, depriving his children of stable homes and the only parent figures they have ever known, and delaying permanency for them. (See, e.g., *Zachary G.*, *supra,* 77 Cal.App.4th at pp. 804-805, 808 [affirming summary denial of mother's section 388 petition seeking return of toddler to her custody despite allegations mother had regular, supervised visits and record indicated visits were appropriate].)

Given the Legislature's elevation of the child's interests over those of the parent after reunification has ended, many appellate courts have affirmed the summary denial of section 388 petitions filed by parents who have taken significant steps to reform yet, like father, could not demonstrate that their children may be benefited by a change in their placement and/or resumption of reunification efforts at a late stage of proceedings, including children who were bypassed for reunification services.

For example, *In re Angel B.*, *supra,* 97 Cal.App.4th 454, involved a child who was born to a mother with a long history of drug abuse, detained at birth and placed into a concurrent home with a foster family that wanted to adopt the baby, and who was bypassed for reunification services with the mother because the mother had failed to reunify with an older sibling. The mother

25

then got a steady job, completed classes, remained sober for four months and visited regularly with her baby. She filed a section 388 petition seeking either custody or reunification services, her petition was summarily denied without a hearing, and the appellate court affirmed on the ground the mother failed to show a change of order was in the baby's best interest. In upholding the ruling the appellate court said this:

"[T]he facts presented by the section 388 petition show that Mother is doing well, in the sense that she has remained sober, completed various classes, obtained employment, and visited regularly with Angel. In addition, we shall assume, for the sake of this appeal, that this time her resolve *is* different, and that she will, in fact, be able to remain sober, remain employed, become self-supporting and obtain housing. Even so, such facts are not legally sufficient to require a hearing on her section 388 petition.

"As noted above, there is a rebuttable presumption that, in the absence of continuing reunification services, stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) To rebut that presumption, a parent must make some factual showing that the best interests of the child would be served by modification.

"Here, Mother has not made such a showing, and it is difficult to imagine how she could have done so, given the fact that Mother never actually parented Angel before her removal, and Angel was immediately placed with an adoptive family and her own sibling. Angel was removed from Mother's custody directly from the hospital, just two days after her birth. She was placed with a family that was not only in the process of adopting her older sibling, Robert, but that also was successfully parenting two biological children and two other adopted children (a sibling set), and that wanted to

26

adopt Angel as well, in part because it valued providing its adopted children with biological siblings. The parents in this family clearly, by deed if not by name, were Angel's parents. They, not Mother, provided Angel with all the day-to-day, hour-by-hour care needed by a helpless infant and then growing toddler. Thus, although Mother's petition states that she has bonded with Angel, and that Angel is happy to see her and reaches for her on their visits, such visits, in total, add up to only a tiny fraction of the time Angel has spent with the foster parents. On this record, no reasonable trier of fact could conclude that the bond, if any, Angel feels toward Mother (as opposed to the bond that *Mother* feels toward Angel) is that of a child for a parent." (*In re Angel B.*, *supra,* 97 Cal.App.4th at pp. 464-465.) Thus, it held, the juvenile court had not abused its discretion in denying mother a hearing. (*Id.* at p. 465.)

Other appellate courts have affirmed in similar situations.[20]

---

[20] See, e.g., *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 (affirming denial of section 388 petitions seeking reunification services for children who were bypassed for services, where parents had extensive histories of drug use and failed to reunify with other children; "Although parents were exerting themselves considerably to improve, they did not demonstrate changed circumstances. Even if parents had succeeded in doing so, there was no showing whatsoever of how the best interests of these young children would be served by depriving them of a permanent, stable home in exchange for an uncertain future"); *Anthony W.*, *supra*, 87 Cal.App.4th at pp. 251-252 (affirming summary denial of section 388 petition filed on the eve of section 366.26 hearing; "Mother made no showing how it would be the children's best interest to continue reunification services, to remove them from their comfortable and secure placement to live with mother who has a long history of drug addiction and a recurring pattern of domestic violence in front of the children. The children should not be made to wait indefinitely for mother to become an adequate parent"); see also *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 323 (affirming summary denial of section 388 petition where mother made no showing a late change of placement from foster care to cousins child barely knew was in child's best interest).

27

And so must we. Unlike in several cases father cites (but does not discuss), father did not allege, and the record does not show, some possible benefit accruing to his children because they were strongly bonded to him and/or to other family members. (See *In re Daijah T.*, *supra*, 83 Cal.App.4th at pp. 674-675 [reversing summary denial of section 388 petition]; *In re Jeremy W., supra*, 3 Cal.App.4th at pp. 1415-1416 [same].) He had never occupied a parental role for any of the children, each of whom was detained at birth. He had virtually no relationship with the six-month-old twins, who had substantial emotional ties to foster parents who had been meeting all of their needs since they were two days old.[21] And with one-and-a-half-year-old Michael, who had bonded to his foster family for an even longer period and identified them as his parents, father experienced significant gaps in visitation due to incarceration and never progressed past the point of supervised visitation.[22] In these circumstances, no reasonable fact-finder

---

[21] Father acknowledges his visitation with them was "minimal." He was in jail for the first several months of their lives, and by the time he filed his section 388 petitions had had only four visits with them. He was reported as being happy to see them, speaking to them gently, kissing them and making an "effort" to spend time with both of them.

[22] Father visited Michael only twice during the first few weeks of Michael's life, got arrested when Michael was about a month old, and then was not able to visit Michael again until the baby was about four months old (on April 6, 2018), after his release from jail and entry into the Turning Point treatment program. For about the next six months, he had supervised visits with Michael twice a week (which caused the baby a lot of distress and crying for the first few months but improved over time), until he was arrested again in December 2018. His visits with Michael during that period were reported as having been "positive," with father described as affectionate, constantly kissing Michael and attending to his needs by changing Michael's diaper, feeding him and interacting with him. But father had not progressed beyond supervised visitation because of concerns he lacked sufficient parenting skills. About two months after father's second arrest, visits resumed on a reduced basis while father was still in jail (for 30 minutes, twice a month)

could conclude that delaying permanency for these young children, and either granting father custody of them with a plan of family maintenance and/or ordering further reunification services, would be in their best interests.

For these reasons, we conclude the juvenile court did not err when it summarily denied father's section 388 petitions without an evidentiary hearing.

## II.

### *The Juvenile Court Did Not Abuse Its Discretion in Denying Aunt Tracie's Request for Placement of the Children.*

Next, we address Aunt Tracie's challenge to the juvenile court's denial of her request for relative placement of the children.[23]  She raises a number of issues, and they are best understood in the statutory context which we summarize first.

### A.    The Statutory Framework.

When a child is detained on an emergency basis, the social services agency must, within 30 days of removal, "conduct . . . an investigation in order to identify and locate all grandparents . . . , [and] other adult relatives of the child . . . , including any other adult relatives suggested by the parents," and give to all adult relatives who are located notice of the case and a statutorily prescribed advisement of their rights to participate in the care and placement of the child.  (See § 309, subd. (e)(1).)  In addition, if a relative comes forward to request placement of the child pending either the detention

---

during February and March 2019, shortly after Michael's first birthday. Upon his release from jail in April 2019, he resumed visiting Michael once a month, and was reported as being patient and loving toward his son, who was reported as now crying again upon transitioning into and throughout the visits and being difficult to console.

[23]  Both parents join in Aunt Tracie's appellate arguments.

29

hearing, or after the detention hearing and pending the disposition hearing, the county welfare agency must immediately evaluate the suitability of the relative as a potential placement. (See *id.*, subd. (d)(1).) Such a relative must be "able and willing" and "have been assessed pursuant to section 361.4" (§ 319, subd. (f)(3) [incorporated by section 309, subd. (d)(1)]), the statute that governs emergency relative placements.[24] In the report prepared for the detention hearing, "[t]he social worker shall report to the court on . . . whether there are any relatives who are able and willing to take temporary physical custody of the child" (§ 319, subd. (b)), and if the child is ordered detained, "the court shall determine if there is a relative who is able and willing to care for the child, and has been assessed pursuant to Section 361.4." (§ 319, subd. (f)(3).)

At the disposition stage, relative placements are governed by section 361.3, the primary statute at issue here. It provides that when a dependent child is removed from parental custody at disposition, "preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . ." (§ 361.3, subd. (a)(1)), and again thereafter "whenever a new placement of the child must be made" as to "relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements" (*id.*, subd. (d).)

In section 361.3, subdivision (a), the statute sets forth a list of mandatory (but non-exhaustive) factors that must be considered by both the social worker and the juvenile court when considering a relative placement.[25]

---

[24] Section 361.4 mandates an in-home inspection of a relative being considered for emergency placement, and for all adults living in the home it also requires a criminal background check and a check of any past allegations of child abuse or neglect. (See § 361.4, subd. (a).)

[25] Those factors are:

30

"(1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs.

"(2) The wishes of the parent, the relative, and child, if appropriate.

"(3) The provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement.

"(4) Placement of siblings and half siblings in the same home, unless that placement is found to be contrary to the safety and well-being of any of the siblings, as provided in Section 16002.

"(5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect.

"(6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful.

"(7) The ability of the relative to do the following:

"(A) Provide a safe, secure, and stable environment for the child.

"(B) Exercise proper and effective care and control of the child.

"(C) Provide a home and the necessities of life for the child.

"(D) Protect the child from his or her parents.

"(E) Facilitate court-ordered reunification efforts with the parents.

"(F) Facilitate visitation with the child's other relatives.

"(G) Facilitate implementation of all elements of the case plan.

"(H)(i) Provide legal permanence for the child if reunification fails. [¶] (ii) However, any finding made with respect to the factor considered pursuant to this subparagraph and pursuant to subparagraph (G) shall not be the sole basis for precluding preferential placement with a relative.

"(I) Arrange for appropriate and safe child care, as necessary.

"(8)(A) The safety of the relative's home.  For a relative to be considered appropriate to receive placement o f a child under this section on an emergency basis, the relative's home shall first be assessed pursuant to the process and standards described in Section 361.4."  (§ 361.3, subd. (a).)

31

Section 361.3 "expresse[s] a command that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child." (*Stephanie M., supra,* 7 Cal.4th at p. 320.)  It "acknowledges . . . that the court is not to presume that a child should be placed with a relative, but is to determine whether such a placement is *appropriate*, taking into account the suitability of the relative's home and the best interest of the child." (*Id.* at p. 321.)

Our colleagues in Division Three have summarized the preference as follows:  "Juvenile dependency laws are meant 'to preserve and strengthen the minor's family ties whenever possible." (§ 202, subd. (a).)  Accordingly, when a child is adjudged a dependent of the court and removed from the parents' physical custody, 'preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . .' (§ 361.3, subd. (a).)  ' "Preferential consideration" means that the relative seeking placement shall be the first placement to be considered and investigated.' (§ 361.3, subd. (c)(1).)  The statute does 'not supply an evidentiary presumption that placement with a relative is in the child's best interests' but it does require the social services agency and juvenile court to determine whether such a placement is appropriate, taking into account multiple factors including the best interest of the child, the parents' wishes, and the fitness of the relative.  ([*Stephanie M.*, *supra,*] 7 Cal.4th [at p.] 320[;] see *id.* at pp. 321-322.)  'The correct application of the relative placement

---

In addition, when considering a relative placement after the disposition hearing, "the county social worker shall consider whether the relative has established and maintained a relationship with the child." (§ 361.3, subd. (d).)

32

preference places the relative "at the head of the line when the court is determining which placement is in the child's best interests." ' " (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1295-1296, fn. omitted.)

In deciding whether a child should be placed with a relative, the juvenile court must independently assess the factors and not defer to the social service agency's evaluation. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033-1034 (*Cesar V.*).)

## B. The Juvenile Court Did Not Err in Declining to Order a More Complete Assessment of Aunt Tracie.

Aunt Tracie argues, first, that the agency's written assessments of her as a potential placement were deficient in a number of respects under section 361.3. The two reports at issue are the agency's evaluation contained in the section 366.26 report filed in Michael's case on May 28, 2019, and a substantially similar evaluation contained in a memo the agency filed in the twins' case on May 29, 2019, entitled "Court Memo Regarding Relative Rule Out." She argues those reports were "incomplete and failed to address most of the relative placement factors." She contends the juvenile court should have recognized those deficiencies and ordered the agency "to conduct a full and complete assessment of all of the relative placement factors and to provide an unbiased report to the court." The fact that it did not do so, she argues, "is error."[26]

---

[26] The parties have cited nothing to suggest anyone brought the asserted deficiencies in the written evaluations to the juvenile court's attention. (See *In re Mary C.* (2020) 48 Cal.App.5th 793, 801 ["To the extent parents base their argument on the omission from the report of statutorily required information, they have forfeited their claim by failing to assert it in the juvenile court"]; *In re A.K.* (2017) 12 Cal.App.5th 492, 500-502 [father forfeited challenge to adequacy of agency's assessment of potential relative placements under section 361.3 by failing to raise issue below].) The agency

It is unnecessary to address the specific claimed deficiencies in the reports, because Aunt Tracie cites no authority holding that an agency's preparation of an incomplete relative evaluation, or the juvenile court's receipt of one, is *reversible* error. The three cases she cites in support of reversal not only involved various failings by the social services agency in evaluating relatives for placement, but also errors by the juvenile court *in applying the law*—namely, failing to independently evaluate potential relative placements pursuant to the section 361.3 factors. Only one of them involved an incomplete relative evaluation (on quite different facts), and in that case the juvenile court held a lengthy contested hearing at which it received additional evidence, and then just erroneously deferred to the agency's original placement decision under an abuse of discretion standard without independently evaluating the statutory factors for itself.[27] (See *Cesar V., supra*, 91 Cal.App.4th at pp. 1030, 1033-1034.) In the other two, the juvenile courts erred by evaluating a request for relative placement under a generalized "best interest" test. (See *In re Isabella G.* (2016) 246 Cal.App.4th 708, 723-724; *In re R.T., supra*, 232 Cal.App.4th at pp. 1299-1300.) Here, the juvenile court did not apply the wrong legal standard nor is there any claim that it did. It heard five days of testimony, and at the conclusion of the placement hearing it emphasized—supported by abundant discussion of the relevant case law, including *Cesar V.*—that it was required

---

has not asked us to deem this issue forfeited, however, and so we will address it on the merits.

[27] In *Cesar V.*, the agency had initiated a perfunctory investigation into the relative's suitability but then abandoned its inquiries before completing them, never contacted the relative again and simply placed the child elsewhere. (See *Cesar V., supra*, 91 Cal.App.4th at p. 1033.)

to conduct its own independent assessment of Aunt Tracie under section 361.3.

As the agency argues, "[d]eficiencies in an assessment report . . . go to the weight of the evidence." (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413; accord, *In re Mary C.*, *supra*, 48 Cal.App.5th at p. 801.) "[E]ven if the assessment is incomplete in some respects, the court will look to the totality of the evidence; deficiencies will go to the weight of the evidence and may ultimately prove insignificant." (*In re John F.* (1994) 27 Cal.App.4th 1365, 1378; see, e.g., *Crystal J.*, at p. 413 [despite fact that assessment reports for permanency planning hearing failed to address statutorily required information about potential adoptive parents' financial stability or criminal record, "ample evidence" supported juvenile court's ruling terminating parental rights in light of "the totality of the evidence before the court," including live testimony].) This principle is not limited to the subject of adoption, as Aunt Tracie implies in her reply brief. (See, e.g., *In re M.V.* (2014) 225 Cal.App.4th 1495, 1511 [deficiencies in assessment report prepared under section 241.1 concerning dual delinquency/dependency jurisdiction held harmless because "the vast majority of the evidence that the minor complains was lacking in the 241.1 assessment was before the court from other sources"]; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 506 [declining to reverse judgment establishing permanent plan of guardianship due to deficiencies in preliminary assessment report, where "the parties fully litigated, explored, and tested the foster parent's suitability as a guardian, and the juvenile court had ample information before it in making its ruling"].)

Here, although we agree the written evaluations themselves were wanting in some respects, all of the statutorily required information that Aunt Tracie contends they omitted was the subject of extensive evidence

35

and/or argument during the five days of hearing. The juvenile court thus had not only the written reports before it but also testimony from numerous witnesses. Aunt Tracie does not explain why the evidence adduced at the lengthy contested hearing did not cure any deficiencies in the written documents.[28] On the contrary, she contends elsewhere in her brief that the evidence adduced at the hearing "as to each and every one of the remaining relative placement factors [aside from Tracie's ability to protect the children from their parents] establishes that placement of [the children] with Tracie was appropriate," and she elaborates upon that evidence for many pages.

In her reply brief, Aunt Tracie argues "the deficiency here was not in the assessment report—the deficiency was in the department's *actual assessment*." (Italics omitted and added.) The distinction is unpersuasive: the reports are a *record* of the department's assessment. Moreover, Aunt Tracie's opening brief squarely frames the issue as deficiencies in the written reports, discussing at length their contents and explaining the ways in which she contends they were not adequate (e.g., at page 54: "Notably missing from the report as to Michael and the memo regarding [the twins] was . . . .")

---

[28] In her reply brief, Aunt Tracie argues that "there is nothing that can explain why the department did not provide the juvenile court with any information about the relatives it was allegedly assessing at disposition in February 2018 and then utterly failed to mention relatives when Michael was placed in a new fost-adopt home in March 2018." To the extent the point is offered as a separate reason to reverse, distinct from the written assessments provided at the time of the contested hearing, we do not consider it. (See *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 592 ["These reply arguments are forfeited as tardy, because appellants must give the other side fair notice and an opportunity to respond"].)

As in *Cesar V.*, the only authority Aunt Tracie cites where an incomplete relative evaluation was at issue, we will proceed to an examination of the juvenile court's relative placement decision based on a review of the entire record of the contested hearing, not just consideration of the agency's reports in isolation.

### C.     The Juvenile Court Did Not Abuse Its Discretion in Denying Aunt Tracie's Section 388 Petition.

This brings us to Aunt Tracie's challenge to the substance of the juvenile court's ruling denying her request for placement of the children with her.

#### 1.     The Parties' Contentions

To her counsel's credit, Aunt Tracie acknowledges "there are many things the juvenile court did correctly in this case," including determining that, because the agency failed to comply with duties regarding relative placement, "the relative placement preference was applicable and controlled its decision on placement; and it correctly conducted an independent assessment as to placement rather than blindly following the recommendations of the department."

In her opening brief, she asserts two errors. Citing *In re H.G.* (2006) 146 Cal.App.4th 1, she argues that one factor cannot be dispositive in evaluating a potential relative placement, and here the juvenile court erroneously relied "primarily" on a finding that Aunt Tracie would be unable to protect the children from their parents (§ 361.3, subd. (a)(7)(D)), when "the evidence as to each and every one of the remaining relative placement factors establishes that placement of [the children] with [her] was appropriate." Second, she argues the court's finding that Aunt Tracie was unable to protect the children from their parents is unsupported by the evidence.

On the merits,[29] the agency argues there was no abuse of discretion because the relative placement was inapplicable at least as to Michael, whose interest in stability "overrode" any relative placement preference.  It also argues that even if the relative placement preference applies, the court considered all of the relative placement factors in rendering its decision, and "ultimately decided that removing the children from their stable and caring foster families to place them with Aunt was not in their best interests," which was within its discretion to do considering the evidence in the light most favorable to the court's ruling, and that Aunt Tracie is just asking us to reweigh the evidence.

In her reply brief, Aunt Tracie raises several new arguments, which we will address only as necessary below.

### 2. Analysis

The parties agree we review the court's placement decision for an abuse of discretion.  (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 317-320.)  What is more, an abuse of discretion must be "clearly established."  (*Id.* at p. 318.)  "[W]hen a court has made a custody determination in a dependency proceeding, ' "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' "  (*Id.* at p. 318.)  " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial

---

[29]  The agency raises an issue we do not need to address as to whether placement decisions it made earlier in the case may be reviewed in these appeals.

court.' " (*Id.* at pp. 319-320.) In conducting that assessment, we review the court's factual findings for substantial evidence. (See *id.* at p. 318.)

*First*, we disagree with both the legal and factual premise of Aunt Tracie's first claim of error. *In re H.G.*, *supra*, 146 Cal.App.4th 1, does not stand for the proposition that the juvenile court may not *base* its decision under section 361.3 primarily on a single relative placement factor. It holds that a juvenile court may not *consider* only one placement factor.[30] Indeed, the language of section 361.3 implies that a juvenile court does have the power to find a single factor dispositive, with limited exceptions. The statute expressly specifies two placement factors that "shall not be the sole basis for precluding preferential placement with a relative" (§ 361.3, subd. (a)(7)(H)(ii)): any finding concerning a relative's ability to facilitate the case plan, and any finding concerning a relative's ability to provide a permanent home if reunification fails (see *id.*, subd.(a)(7)(G) & (H).) "When

---

[30] *In re H.G.* reversed a juvenile court ruling removing a child from a placement with her grandparents after they allowed the child to have unauthorized contact with her father following a death in the family, and it remanded the matter for a new hearing. In sustaining the agency's section 387 petition seeking a more restrictive placement in foster care, the juvenile court erroneously considered *only* the unauthorized parental contact (which implicated only the safety of the grandparents' home (see § 361.3, subd. (a)(7)(A)) and their ability to protect her from her parents (see *id.*, subd. (a)(7)(D)) but did not consider any of the other relative placement factors. (See *In re H.G.*, *supra*, 146 Cal.App.4th at pp. 15-17, 19.) The agency's section 387 petition did not allege, nor did the court find, that any of the other criteria that had led to the initial determination that the grandparents were an appropriate placement had changed, nor did the court consider (for example) the child's exceptional emotional and psychological needs or her interest in maintaining the stability of her current placement. (*In re H.G.*, at p. 16.) The matter was not reversed outright, but remanded with directions to hold a new hearing and consider all of the section 361.3 criteria. (*In re H.G.*, at p. 19.)

language is included in one portion of a statute, its omission from a different portion addressing a similar subject suggests that the omission was purposeful." (*In re Ethan C.* (2012) 54 Cal.4th 610, 638.)

It is unnecessary to address that legal question, however, because the juvenile court did not rely solely on Aunt Tracie's inability to protect the children from their father in declining to remove the children from their concurrent homes, a decision it acknowledged was "extremely tough." With commendable thoughtfulness, it carefully discussed a great deal of caselaw and then independently evaluated the suitability of Aunt Tracie as a potential placement, citing and discussing many factors under section 361.3, in a ruling that encompasses 20 pages of reporter's transcript.[31]

In addition to finding Aunt Tracie would not be able to protect the children from their father (which we next address), the juvenile court found that a change of placement would not be in the children's best interests, because the children were bonded with their current caretakers and had special needs due to their in utero drug exposure. (See, e.g., *Stephanie M.*, *supra*, 7 Cal.4th at p. 325 [upholding ruling made on similar grounds].) The court said Michael had potentially life-long special needs arising from his in

---

[31] Although Aunt Tracie argues the juvenile court didn't consider every statutory factor, she cites no authority suggesting the court must weigh each and every factor expressly, aloud in open court. There is no indication the court *declined* to consider the relevant factors, and we cannot presume error from a silent record. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) On the contrary, both the content of the court's oral ruling and the thoroughness with which the relative placement preference was litigated, briefed, and argued leave us with no doubt the juvenile court considered the pertinent factors. (See, e.g., *In re Maria Q.* (2018) 28 Cal.App.5th 577, 584, 599–600 [although juvenile court did not formally consider the section 361.3 factors, its remarks indicate it applied them in considering minors' best interests].)

utero drug exposure, and was securely bonded to his foster parents of 20 months who were meeting all of his needs and were "the only parents he has ever known."

With regard to the twins, the court was "particularly compelled" by testimony that the twins' pediatrician "thought it would be devastating to the twins' health if they were removed from the caretakers that they've had now for the last almost nine months, and that their best interests, based on their physical, psychological, educational, medical or emotional needs were being served by their [current] caregivers . . . ."

Regardless whether the court's concern for the safety of the children has support in the evidence (a subject we discuss next), the court did not abuse its discretion in denying placement with Aunt Tracie in these circumstances.

We discuss portions of *Stephanie M.*, *supra*, 7 Cal.4th 295 at some length because, while not precisely on all fours, it bears many similarities and makes quite clear the broad deference we owe a ruling denying a relative's motion to change a foster child's placement, even though such a motion implicates section 361.3 and the potential maintenance of family ties.

At issue in *Stephanie M.* was the denial of a Mexican grandmother's section 388 motion to remove a young child from her concurrent home and have the child placed with her, in Mexico, at a late stage of proceedings after reunification services had been terminated. The child had lived in grandmother's home for the first nine months of her life, but then moved with her mother to the United States to join her father, and four months later was removed from their custody because she was being physically abused. Shortly after the detention hearing, the grandmother requested placement and the social services agency initially recommended the placement because

the child was attached to her grandmother. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 304.) But by the time of the disposition hearing, concerns had arisen that the child had been malnourished in Mexico and that the grandmother didn't believe the parents had abused the child and thus could not protect the child from them. (*Id.* at pp. 304-305.) So, at both the disposition hearing and then again at the six-month review hearing, the child was continued in foster care amid mounting concerns, and further evaluations of grandmother were undertaken (including by the Mexican social services agency, which supported grandmother's request for placement; the social worker, who initiated a second home study and ultimately recommended against placing the child with her grandmother; the child's court-appointed special advocate, who expressed concerns about the grandmother's ability to protect the child; and a psychologist working with the parents, who recommended against the placement). (See *id.* at pp. 304-306.) The grandmother eventually made an appearance in the case at the 12-month review hearing, at which point the court scheduled a contested hearing to decide whether to place the child with her, which was stipulated to be pursuant to section 388. (*Stephanie M.,* at p. 306.) Subsequently, the court heard extensive testimony at the contested hearing, including about the child's psychological fragility due to the severe abuse she had suffered and her need for stability, and ultimately it denied the motion for change of placement. (*Id.* at p. 308.) It discounted as a "non-issue" concerns the child might have been malnourished while living in Mexico, and also concluded the grandmother would protect the child (by following the directions of Mexican child welfare authorities). (*Id.* at p. 318.) But despite finding the grandmother's home was suitable, it concluded that a change was not in the child's best interest, because of her emotional needs

and lack of a primary emotional bond with her grandmother. (*Id.* at pp. 308, 324.)

The appellate court reversed, holding the juvenile court had abused its discretion in several respects, including by failing to accord sufficient weight to the relative preference under section 361.3 and by elevating a concern with the child's bond to her foster parents over the interests in preserving familial bonds. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 319.)

The Supreme Court reversed the court of appeal's decision. Addressing the relative preference, it held the juvenile court did not abuse its discretion by failing to give sufficient weight to the statutory relative preference. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 320-322.) The Supreme Court assumed without deciding that the statutory preference applied at that late stage of proceedings, but explained the statute "did not operate as an evidentiary presumption in favor of placement with the grandmother that would overcome the juvenile court's' duty to determine the best interests of the child," and that "[i]n the context of a motion pursuant to section 388 for a change of placement after the termination of reunification services, *the predominant task of the court was to determine the child's best interest*, which the court did here." (*Id.* at p. 320, italics added.)

It then upheld the juvenile court's exercise of discretion to reject the grandmother's request for placement, even though the juvenile court found she *could* provide a safe and appropriate home and *despite* concerns that the agency and the juvenile court did not properly consider her for placement earlier in the case. The court explained:

"The question before the juvenile court at the hearing on change of placement was, at bottom, to determine whether a change of placement was in the best interests of the child. The grandmother's home had been

43

evaluated. She testified at the hearing. The court carefully considered the question of placing the child in her custody, and essentially found her home to be a suitable one. Nonetheless, it was the considered judgment of the juvenile court that a change of placement was not in the child's best interest, in view of her fragile emotional state and her successful and enduring bond with the foster parents. We see no abuse of discretion or misapplication of the [relative placement preference] statute in this conclusion.

"The Court of Appeal also criticized the lower court for failing to give sufficient weight to the relative placement preference from the very outset of the proceedings. However, at the hearing on the motion for change of placement, the burden was on the moving parties to show that the change was in the best interest of the child at that time. *Evidence that at earlier proceedings the court had not sufficiently considered placement with the grandmother was not relevant* to establish that at the time of the hearing under review, placement with the grandmother was in the child's best interests."[32] (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 321-322, italics added and omitted.)

---

[32] In a footnote, the Supreme Court noted that the grandmother's home was in fact evaluated and considered earlier the proceedings, and "[t]his is not a case in which the relative's home was not evaluated or considered at all." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 322, fn. 9.) Here too, although the home approval process experienced many unfortunate delays, social worker Ann Grubaugh contacted Aunt Tracie shortly after Michael's detention hearing (in late December or early January 2018), and initiated the ICPC assessment process thereafter, when Michael was around two months old and nearly a year before the twins were born. After Tracie moved to California, the agency assessed her in person in April 2019, which the juvenile court said was "relatively late" in Michael's case but "relatively soon" for the twins who were born a few months earlier.

The Supreme Court also addressed the subject of the child's bonding with her foster parents at some length. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 324-326.) In overturning the juvenile court's decision, the appellate court had acknowledged the child's close bond to her foster parents (and lack of bond with her grandmother), but reasoned that it was surmounted by the interest of preserving familial ties with the grandmother, who was a willing and loving caretaker who had consistently shown an interest in the child. (*Id.* at p. 324.) The Supreme Court held the appellate court had erred by "giving too great weight to the grandmother's interest in maintaining a family tie with the child and substituting its judgment for that of the juvenile court[,] . . . [¶] at a point when the interest of the child in stability had become paramount . . . ." (*Ibid.*) "The essence of the juvenile court's ruling," it explained, "was that the child was fragile, that she had a strong, healthy bond with the foster mother, and essentially no bond with the grandmother, despite the opportunities that had been available to the grandmother to create such a bond. The juvenile court correctly focused on these factors in deciding the best interests of the child." (*Id.* at p. 325.)

Next, the Supreme Court rejected an argument by the child's parents: "that a child's bond with foster parents cannot be the *sole* basis for a custody determination, and that, in fact, social scientists no longer unanimously recognize the continuation of a child's primary bond with a 'psychological parent' as essential to the child's ultimate psychological well-being." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 325, italics added.) It disputed that characterization of the juvenile court's ruling, explaining that the court did not reject the change of placement "solely" because of the child's bond with the foster parents. (*Ibid.*) "Rather, the court was careful to explain that the child was quite fragile and had special needs, and that in her particularly

delicate condition, a change of placement to a relative whom she barely knew would not be in her best interests." (*Ibid*.) The Supreme Court also gave short shrift to the parents' reliance on new views in child psychology: "[W]e need only respond that the law is not in thrall to passing psychological theory. [Citations.] The Legislature has declared that a dependent child has an interest in continuity and stability in placement. [Citations.] This interest was served by the order denying change of placement."[33] (*Stephanie M.,* at p. 326.)

The primacy of these interests, and the deference we owe the court's ruling, is illustrated by other cases that likewise have affirmed the denial of requests for a change in placement to relatives made late in proceedings, after reunification services have been terminated. (See, e.g., *In re Maria Q.*, *supra,* 28 Cal.App.5th at pp. 596, 599-600 [change of placement from foster home to aunt's home was not appropriate under section 361.3 factors, despite "ample evidence" aunt's home was suitable and she truly cared for two children, where 10-year-old and four-year-old sisters had no attachment to aunt, they were bonded to foster parents and removal from their care would be detrimental "if not traumatic"]; *In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1109, 1112-1113 [no abuse of discretion to reject request for relative placement of two-year-old child with out-of-state aunt; although department

---

[33] The Supreme Court's holding on this point refutes Aunt Tracie's argument made for the first time in her reply brief, based on an article discussing recent academic research (Boyles, *When Do Kids Form Their First Memories?* (May 11, 2011) WebMD <https://www.webmd.com/parenting/news/20110511/when-do-kids-form-their-first-memories#1> [as of Mar. 29, 2021]), that the children "were really not likely to suffer any lasting harm from a change in placement . . . because they were unlikely to remember the portion of their lives spent with their caretakers for very long in that those memories would quickly be replaced by new memories with Tracie."

expedited the ICPC process, "[p]roblems . . . nevertheless arose and time went by," and the child "now about three years old, bonded with her foster parents"; citing, inter alia, § 361.3 and *Stephanie M.*].)

Of particular note is *In re M.H.* (2018) 21 Cal.App.5th 1296 (*M.H.*), which affirmed the denial of a relative's request for a change in placement of a 14-month-old baby who, like the children here, had been detained at birth due to his mother's methamphetamine use during pregnancy and who lived virtually all of his short life in a concurrent home with (nonrelative) foster parents. After reunification services had been terminated, both the out-of-state relative (who, among other things, had six years' experience running a childcare center and two years as a foster parent, and whose home had been approved pursuant to the ICPC) *and* the social services agency advocated for the change in placement. But counsel for the baby boy opposed the change in placement, and the juvenile court denied the request. (See *M.H.,* at pp. 1299-1301.)

On appeal, our colleagues in Division Three held that the statutory preference for relative placement did not apply,[34] but that some of the juvenile court's findings were not supported by the evidence. The juvenile court had improperly dismissed an argument the child would benefit from being raised by his biological family, improperly faulted the relative for not visiting the child sooner (in fact, she was waiting for the agency's permission), and improperly discounted the benefits of placing the child with a family that shared his racial heritage. (See *M.H., supra,* 21 Cal.App.5th at

---

[34] The court gave two reasons: because the aunt was not related to the baby by a close enough degree of kinship, and also because the case was post-disposition and no change in placement was necessary. (*M.H., supra,* 21 Cal.App.5th at pp. 1302-1303.)

p. 1305, fn. 4.) Despite these erroneous findings, our colleagues held the court did not err in denying the aunt's request for placement, and said this:

"Placement in this case presented an unusually difficult question. The court was faced with two good options: both the de facto parents with whom the minor had lived since shortly after birth and the great aunt who cared for the minor [and] appeared willing and able to provide the minor with a loving home. [Aunt] offered the minor important biological family connections, but the minor had already bonded with the de facto parents. In weighing the relative merits of the alternatives before it, we do believe, as the agency and [Aunt] argue, that the court made some unfortunate factual misstatements and disparaging comments about [Aunt's] ability to care for the minor that are not supported by evidence in the record. Nonetheless, the court was fully aware of the difficulty of the choice and with the parties before it, was best able to make the hard call of which placement, under the circumstances as they then existed, was in the minor's best interest. *The uncontroverted evidence was that M.H. was thriving in his current placement. Faced with the successful bonding of the minor with the de facto parents, and the uncertainty of how the minor would respond to removal from the parental figures he had known since birth, we cannot say that the court abused its discretion in concluding that his continued placement was in his best interest.*" (*M.H., supra,* 21 Cal.App.5th at pp. 1305-1306, fn. omitted, italics added.)

Our colleagues also made an observation that is equally apt here:

"It is unfortunate that in circumstances like those here, in which an out-of-state relative expresses interest in placement shortly after removal but is unavailable for immediate placement for reasons beyond the relative's control, the preference for relative placement can be frustrated. . . . As the court explained in *In re Lauren R.* [(2007)] 148 Cal.App.4th [841,] 855, '[t]he

48

overriding concern of dependency proceedings . . . is not the interest of extended family members but the interest of the child. "[R]egardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected." [Citation.] Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests. [Citation.] The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests.' " (*M.H.*, 21 Cal.App.5th at pp. 1303-1304.)

These authorities compel us to affirm. The issue we face in this case is not whether a reasonable judge might have made a different decision. This record leaves room for a court to draw different inferences and come to different conclusions. But a "clear" abuse of discretion has not been shown.

By the time of the contested placement hearing, Michael—who was even older than the baby boy in *M.H.*—had spent all but a few months of his life with his foster parents, had securely bonded with them and regarded them as his parents. By contrast, he didn't recognize Aunt Tracie, was described as "very distant" during their visits, would often cry at the beginning of the visits and then be very happy to see his foster parents afterward, and he took a long time to recover from visits, sometimes having a "meltdown."

The eight-month-old twins (now, two years old), also had attached to their foster parents, albeit for less time. They, too, did not recognize Aunt Tracie despite her four visits with them.

Moreover, social worker Traci Bernal testified about the twins' special needs arising, according to their pediatrician, from in utero drug exposure,

49

which increased their need for stability and enhanced the difficulty of transitioning them to a new home.[35]  Bernal testified at some length about her concerns that a change of placement would likely cause developmental setbacks for them, with medical impacts (weight loss, regression and, for R.A., physical pain), and possibly with life-long consequences.  Bernal was confident the twins would be traumatized if moved now, given their special needs.[36]  She acknowledged the trauma could be alleviated with support

---

[35]  The twins were born three weeks prematurely.  R.J. has gastrointestinal issues that make her extremely difficult to feed, because it is painful for her to eat.  She suffered a great deal of weight loss, and there are continued concerns about her weight.  Bernal testified that, according to the children's pediatrician, these issues resulting from her severely underdeveloped gastrointestinal system could potentially "shift" within a year but potentially could affect her throughout her childhood; "there's no way to predict that."  Bernal also testified the pediatrician believes that R.J.'s physical needs make her bond to her caregiver even more important than a typical child's, because it impacts her ability to eat, get nutrition and gain weight.  And Bernal testified that because it takes a great deal of time to feed her, she requires a caregiver with a great deal of patience.

R.A.'s gastrointestinal issues are less acute, but she has developmental delays with muscle tone and stiffness and with her fine motor skills that require weekly physical therapy.

Their in utero drug exposure has a host of potential long-term consequences, but it is impossible to predict whether the girls will be affected by them over their lifetime.

[36]  For example, she described the babies struggling during visits (not eating, getting overstimulated, and "physically check[ing] out . . . sometimes to the point of putting themselves to sleep"), and testified they routinely returned from visits extremely exhausted and "clingy," and would eat twice their normal amount and then throw up.  She also testified that the day after one visit, R.A.'s physical therapist was struck by how much pain R.A. was experiencing and the baby was unable to engage in their normal course of therapy, which was very unusual.  The therapist was so taken aback by this, she raised a concern about it with the foster parents.

services, but not eliminated. Bernal also testified she didn't think Aunt Tracie fully understood their special needs or the trauma that could ensue by changing their placement. According to Bernal, the children's pediatrician also was concerned their health could decline if they changed placement, with risks to their development and weight gain, due to the stress involved ("[t]hat's a huge possibility as I spoke with the pediatrician about").

In light of these circumstances, we cannot say the juvenile court abused its discretion. The three children had no attachment to Aunt Tracie, and they were being successfully cared for by caretakers with whom they had spent most of their young lives. Given the children's fragility, and the uncertainty of how they would respond to removal from their foster parents to whom they had bonded and who were meeting all of their emotional and medical needs (and in the twins' case, the potential medical risks associated with a change of placement identified by their pediatrician), we cannot say the court abused its discretion in denying Aunt Tracie's request for relative placement, regardless of the court's finding as to her inability to protect the children. (See *Stephanie M.*, *supra*, 7 Cal.4th at p. 325; *M.H.*, *supra,* 21 Cal.App.5th at p. 1306.)

Aunt Tracie does not dispute the children have formed bonds with their current caregivers, but argues that evidence of the children's bonds with their current caregivers cannot be dispositive, because it resulted from the department's failure to notify and promptly assess relatives for placement and the conflict of interest of minor's counsel. Had those things not happened, she argues, it is likely the children would have been placed together in her home. We are by no means insensitive to these concerns and, like the juvenile court, do not condone or find excusable the agency's lapses that took place in this case with regard to assessing relatives for placement

51

early on. But who is to blame is not the issue. (See *M.H.*, *supra,* 21 Cal.App.5th at pp. 1303-1304.) There was an available remedy for any errors made earlier by the agency to assess Aunt Tracie, which would have been prompt objections by either parent to the agency's decision to place the children in the home of non-relatives and to bring those concerns to the juvenile court's attention quickly, so that the issues could be fully aired much sooner, followed (if need be) by seeking writ relief from this court to avoid the prejudice occasioned by the passage of time. (See, e.g., *Cesar V.*, *supra*, 91 Cal.App.4th at p. 1036 [granting writ relief].) At this stage of proceedings, evidence that Aunt Tracie was not sufficiently considered for placement earlier was not relevant to assessing the children's best interest at the time of the contested placement hearing. (See *Stephanie M.*, *supra*, 7 Cal.4th at p. 321.)[37]

At bottom, Aunt Tracie is asking us to commit the same error the Supreme Court condemned (and reversed as erroneous) in *Stephanie M.*: to reweigh the benefits of preserving the children's family ties to an adult relative with whom they have no real relationship against the potential

---

[37] Aunt Tracie also argues *M.H.* is inapplicable because in that case, the relative came forward *after* disposition and the agency had "met its statutory duty" with respect to the placement request.

We do not agree. There was no issue raised in *M.H.* as to whether the agency had complied with its duties to notify and assess relatives for placement. Furthermore, the facts there were similar. The relative in that case (an aunt who lived out-of-state) telephoned the agency to express interest in adoption when the child was two days old, and she reiterated her interest when the agency contacted her about six weeks or two months later (*M.H.*, *supra,* 21 Cal.App.5th at p. 1301); in the interim, when the child was about three weeks old, the disposition hearing took place (*id.* at p. 1299). Not until the child was three months old did the agency initiate an ICPC request to begin the process of assessing aunt for a possible placement, a process that ultimately took about seven months. (See *M.H.*, at pp. 1299-1300.)

detriment of removing them from the only homes they have ever known, with foster parents who have been attending to their unique emotional, medical and developmental needs. We cannot say the court abused its discretion in making this difficult choice.

This brings us, then, to Aunt Tracie's argument that the court's findings she could not protect the children from their parents lacks support in the evidence. The court's findings in this regard, which the court characterized as "dispositive," are not critical to our assessment, but lend further support to our conclusion that the juvenile court did not err.

The juvenile court made findings, based upon father's extensive past history with drugs and crime, that substance abuse "is going to be a life-long challenge for him," that he had engaged in deceptive, dishonest behavior including attending visitation with the children while there was likely an outstanding arrest warrant for him for violating probation, and that "[w]hoever has your children are going to have to be protecting them for years to come." These findings are not contested on appeal. It then made the following findings concerning Aunt Tracie:

"*I don't believe that you can protect them.* I believe that in looking at what's part of the evidence, the Facebook posts and the GoFundMe posts and the statements that you've made, is [*sic*] that *you are absolutely convinced that your brother is a wonderful person that has put these problems behind him.* He had you convinced completely and totally . . . that . . . the birth of his children would change him completely . . . and there's quotes [from] you, not only in your testimony but in the information I've reviewed, 'He deserves to be able to raise his children.' [¶] *And it's this Court's firm belief that if the children were placed with you, he would do everything in his power to be with*

53

*those kids and see those kids, and it would be beyond any paternal relative's ability to protect these children from him."*[38]  (Italics added.)

Substantial evidence supports these findings.  Despite Aunt Tracie's testimony that she would do all that was needed to protect the children from their parents, understood father had a serious drug addiction, and knew how to assess whether he should have contact with the children, the trial court was entitled to discount her testimony (or reject it altogether), and come to the opposite conclusion.  Her testimony at the hearing was considerably different in tone and substance than the tenor, for example, of her Facebook posts from March 2019 that the juvenile court specifically mentioned, which reflect a high degree of optimism that her brother had, or soon would, overcome his problems and was a suitable parent.[39]  Many of these comments were duplicated in a narrative she later filed with the court in support of her section 388 petition.  There also was evidence that in May 2018, Aunt Tracie told a social worker during a supervised visit that she didn't plan to follow up

---

[38]  At later hearings, the court elaborated that its safety concerns were also based on father's extensive criminal record, which included crimes of violence, the severity of which Aunt Tracie "really never acknowledged."

[39]  For example, in a posting describing an offer she made at the outset of Michael's case to take in the whole family if need be, she wrote, "It was made clear by [the social worker] that they didn't want the parents in the same home as little Michael, *even if it was a very healthy, safe, and structured environment.*"  (Italics added.)  In another posting, she described father's later expulsion from his court-ordered treatment program as a "bump," and lauded him for his subsequent efforts to "tak[e] the initiative to get right back into a healthy situation, and to try to remedy everything."  She wrote, "He has been such an intensely changed person through all of this.  He was always very warm hearted, but now he was acting responsibly.  This had been one, seemingly minute, mistake in the grand scheme of this colossal amount of change. . . . He had made so much progress . . . ."  And in another one she wrote, "He doesn't deserve this.  He's such a good dad."

and start the RFA process in Los Angeles (after she'd moved from Georgia) because father was doing so well she expected him to get Michael back before Michael's first birthday. And social worker Bernal testified Aunt Tracie not only appeared to minimize father's problems but gave the impression she thought father had been treated unfairly.[40]

"Our job is not to reweigh the evidence. The juvenile court, sitting as trier of fact, heard the witnesses testifying and was in a better position than we are to adjudge their testimony." (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 864 [upholding denial of relative placement request].) Despite Aunt Tracie's testimony about her ability to recognize the signs of substance abuse and the caution she would exercise in exposing the children to their father, we cannot substitute our judgment for that of the juvenile court. Another trier of fact might well have sided with Aunt Tracie. But indulging all reasonable inferences from the record, there is substantial evidence she possessed an extremely optimistic assessment of her brother's ability to overcome his lifelong descent into drugs and crime, and harbored a significant desire for him to maintain some kind of contact with his children. There is thus substantial evidence of considerable uncertainty as to her ability to maintain boundaries with father, so as to protect the children from his ongoing struggle with substance abuse and criminality.

Finally, we note that the court's finding that father would do everything in his power to see his children proved to be quite prescient, because a short time after the court ruled, father's own conduct proved the point. About a month and a half after the court's September 10, 2019 ruling denying Aunt Tracie's petition, he managed to obtain confidential contact

---

[40] Aunt Tracie denied ever saying this, and testified she had no opinion on the subject.

information for Michael's foster parents and sent them harassing texts that included pictures of their home and car, telling them that "you have something of mine," expressing gratitude for their care of Michael and pressing them for contact.[41]  Police were contacted, and the juvenile court issued a restraining order against father to prevent him from contacting the foster parents or Michael.  There was also an outstanding arrest warrant for him in Los Angeles, where he had failed to report to probation, and eventually he was located and arrested on the probation violation.  Although we do not consider this evidence in reviewing the sufficiency of the evidence at the time the court rendered its ruling, it does quite clearly indicate that any error in the court's finding at the time was harmless.

In sum, as loving a potential parent as Aunt Tracie quite obviously would have been, and despite the admirable lengths to which she went to uproot her life and move to California to provide a home for these children, the trial court did not abuse its discretion in denying her section 388 petition requesting that the children be placed with her.

---

[41]  He wrote:  "You have something of mine. [¶] How is my son. [¶] You and your wife love mikey and I know he loves you two. [¶] Just praying that when CPS and the court is finally out of this you will both want to be open with us.  They've railroaded our visits because they don't want that for any of us.  We will always appreciate you for taking great care of him and only want the same respect back.  I know they tell foster parents not to communicate, but we would never be anything but civil to both.  And she is also heartbroke her other kids may not get that relationship either.  Thanks again, please don't be apprehensive about talking with us."

## III.

### *The Juvenile Court Did Not Err in Declining to Declare a Mistrial After Relieving the Children's Counsel Due to Her Conflict of Interest and Then Appointing the Children a New Attorney.*

This brings us to attorney Julian's conflict of interest.

Joining in and supplementing each other's arguments, father, mother and Aunt Tracie all contend the juvenile court erred by declining to declare a mistrial on all findings and orders after February 2018, which is when Julian's ability to represent the children became materially limited by her actual conflict of interest. Assuming without deciding the parties have standing to raise these issues, we conclude the juvenile court did not err.

The trial court's power to declare a mistrial is not derived from statutory authority but, essentially, the common law. (*Blumenthal v. Superior Court* (2006) 137 Cal.App.4th 672, 678.) "The fundamental idea of a mistrial is that some *error* has occurred which is too serious to be corrected, and therefore the trial must be terminated, so that proceedings can begin again. (See 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 181, p. 207 ['A mistrial is the termination of a trial prior to completion, on order of the judge, for error too serious to be corrected.']; Code Civ. Proc., § 616 [provision for trial to begin immediately again where jury has been prevented from rendering verdict].)" (*Ibid.*)

As the agency points out, without contradiction by any of the appellants, we review the court's denial of a mistrial for an abuse of discretion. (*People v. Schultz* (2020) 10 Cal.5th 623, 673.) " ' "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' " (*Ibid.*) A mistrial should be granted " 'only when a

party's chances of receiving a fair trial have been irreparably damaged . . . .' " (*Ibid.*)

Although appellants have cited us no authority addressing the court's authority to declare a mistrial in juvenile dependency proceedings, we perceive no legal or logical impediment to doing so with respect to a particular *hearing*. This practice is in fact reflected in one appellate decision cited by mother on another point. (See *In re David D.* (1994) 28 Cal.App.4th 941, 946 (*David D.*) [noting mistrial was declared during contested 12-month review hearing due to conflict of interest of mother's counsel].) Therefore, in this case we may readily assess the juvenile court's refusal to declare a mistrial of the contested placement hearing *itself* under the abuse of discretion standard.

Doing so, we find no abuse of discretion. The juvenile court appointed the children new, unconflicted counsel who undertook a complete and thorough assessment of the case—including with the benefit of interviewing all concerned—and, when given the opportunity to do so, *declined* to put on any new evidence or argument, essentially resting on the current state of the record, did not ask for a mistrial on the children's behalf, and urged the juvenile court to let the placement decision stand. In denying a mistrial, the juvenile court was well within its discretion to conclude that the remedy of appointing new counsel and, in effect, affording her an *opportunity* to change the children's legal position or to put on new evidence both adequately protected the children's interests in the placement hearing, and also virtually eliminated any conceivable impact of Julian's participation in the contested hearing on the other parties, all of whom were themselves represented by conscientious, competent counsel. "[T]he trial judge, present on the scene, is obviously the best judge of whether any error was *so prejudicial to one of the*

58

*parties* as to warrant scrapping proceedings up to that point." (*Blumenthal v. Superior Court*, *supra*, 137 Cal.App.4th at p. 678.) Moreover, it is difficult to fathom that the state of the evidentiary record at the placement hearing could or would have been significantly different had the juvenile court declared a mistrial and started all over again, this time with the children represented by unconflicted counsel. Indeed, in light of the children's overriding interest in prompt resolution of their custody status at this stage of proceedings, we question whether the juvenile court would have abused its discretion had it *granted* a mistrial. Even outside the dependency context, there is a "presumptive (and commonsense) reluctance to allow the waste of resources that mistrials entail." (*Id.* at p. 679.)

Citing three criminal cases (*People v. Coleman* (1992) 9 Cal.App.4th 493, 496; *People v. McNally* (1980) 107 Cal.App.3d 387, 393; *People v. Manson* (1976) 61 Cal.App.3d 102, 202), Aunt Tracie argues that an actual conflict of interest between a party and his or her attorney constitutes a legal necessity for granting a mistrial, and the appointment of substitute counsel is not an appropriate remedy. The cited cases are factually distinguishable, however. More fundamentally, criminal cases are inapt, because "[t]he rights and protections afforded parents in a dependency proceeding are not the same as those afforded to the accused in a criminal proceeding." (*In re James F.* (2008) 42 Cal.4th 901, 915-916; see also *In re Christopher L.* (2020) 56 Cal.App.5th 1172, 1186-1187, review granted, 2021 Cal. Lexis 1215, Feb. 17, 2021, S265910.)

Citing attorney disqualification cases (*Earl Scheib, Inc. v. Superior Court for Los Angeles County* (1967) 253 Cal.App.2d 703; *Kraus v. Davis* (1970) 6 Cal.App.3d 484), Aunt Tracie also argues in her reply brief that "prejudice to the children . . . must be presumed." Again, we disagree. The

question here is not whether the children's rights have been prejudiced—they have not appealed. Nor is it the question whether disqualification was warranted. The juvenile court did disqualify Julian. The question is whether Julian's conflict of interest "incurably" prejudiced appellants at the contested hearing (*People v. Schultz, supra,* 10 Cal.5th at p. 673), warranting them the remedy of a mistrial. For the reasons we have discussed, we will not disturb the juvenile court's implicit determination that it did not.

This brings us, then, to the appellants' contentions about turning the clock back even farther, to February 2018, which was nearly the beginning of Michael's case. And here we also are unpersuaded, albeit for different reasons.

The principal difficulty is that appellants cite no legal authority authorizing the juvenile court to order a "mistrial" in the sense used more broadly here—that is, to vacate prior rulings in the dependency case and to begin anew because of error that they claim incurably prejudiced them. In effect, what the appellants advocate is the equivalent of a request under section 388 for a change of prior court orders, sweepingly across-the-board, but without meeting the requirements of that statute—one of which, as we have discussed, is the children's best interests. Undoing all prior court orders because of an undeclared conflict of interest, untethered from consideration of the children's best interests, would violate section 388, the entire thrust of the dependency scheme which favors prompt resolution of a child's custody status given a child's need for a stable, permanent home (see *In re Marilyn H., supra,* 5 Cal.4th 295, 307-308; § 352, subd. (a)(1)), and common sense. Appellants thus have not persuaded us the juvenile court possessed legal authority to do what they say it should have done.

But even if it did have authority to claw back all rulings since nearly the start of these proceedings because of an undisclosed conflict of interest, we would still conclude there was no abuse of discretion. The closest analogy of which we are aware is the principle, established by our Supreme Court, that *an appellate court* should set aside a judgment in a dependency proceeding when a child has been represented by conflicted counsel "only if [the appellate court] finds a reasonable probability the outcome would have been different but for the error" of allowing the conflicted representation. (*In re Celine R.* (2003) 31 Cal.4th 45, 60.) The parties acknowledge this standard and essentially argue the conflict here did *not* constitute harmless error. But the question is more nuanced: did the juvenile court abuse its discretion in essentially concluding that it *was* harmless? That is, could a reasonable judge have decided, on this record, that it was *not* reasonably probable the outcome would have been different had the children been represented by unconflicted counsel beginning in March 2018, the point at which the conflict materialized?

The answer is yes. The trial court did not apply the "reasonable probability" standard in evaluating the impact of Julian's conflict, but it thoroughly inquired into the impact of the conflict, was informed by the children's new counsel that the conflict *possibly* impacted Julian's performance in only limited ways, and heard extensive argument by the parties on the subject. Specifically, attorney Rodney, charged with conducting an independent assessment of the question, conducted a thorough, independent, off-the-record investigation, and reported to the court that Julian's conflict of interest did not prejudicially affect the parent's rights; she concluded that their loss of parental rights ultimately resulted from their own failings and inability to overcome their struggles with substance abuse.

61

Nor did she conclude that the children's placement with non-relatives was prejudicially impacted by Julian's conflict; she concluded only that it *might* have been (and not nearly to the same degree, or as far back in time, as the appellants contend[42]), but that ultimately "[w]hether reasonable minor's counsel could have supported placement for Michael or the twins with [Aunt Tracie] at any point in time *cannot be determined*." (Italics added.) Having received this assessment—one that no party has challenged as lacking support in the record—we cannot say the juvenile court abused its discretion in declining to hit the "reset" button, wipe out nearly two years' worth of proceedings, reopen the reunification period and/or the question of bypass (a remedy we ourselves are powerless to order (see *In re Nia A.* (2016) 246 Cal.App.4th 1241, 1249), revisit the question of the children's temporary placements, and place these young children in continued legal limbo. All of appellants' arguments to the contrary simply ignore our abuse of discretion standard of review.

## IV.

### *Cumulative Error*

Next, relying on *David D.*, *supra*, 28 Cal.App.4th at pages 951-953 (*David D.*), mother argues that cumulative errors in the proceedings put the children "on a path to adoption with nonrelatives as a result of their counsel's actual conflict," the cumulative effect of which rendered the final decision to terminate parental rights a "nullity." She asserts, without elaboration, that

---

[42] For example, she concluded that unconflicted counsel might have *interviewed* Aunt Tracie as a possible placement only after February 2019, when father's reunification services were terminated but that it was appropriate for Julian to have relied on the agency's relative assessment efforts earlier. And the impact on the twins' placement was even more "attenuated."

"[t]he cumulative effect of the errors in this case resulted in the improper placement of the children in two separate nonrelative adoptive homes," and that therefore all rulings after February 2018 should be reheard. Father and Aunt Tracie join in her argument.

These arguments are undeveloped, conclusory and unpersuasive. Insofar as the errors that have been briefed on appeal, we have rejected them. Moreover, *David D.* is distinguishable. It is an "extraordinary" case (*David D.,* 28 Cal.App.4th at p. 951) involving "distortions of reality" by child protective officials described as "Kafkaesque" (*id*. at p. 952) that led to a failure to provide reasonable reunification services and visitation which, in the end, led inevitably to the termination of parental rights. (See *id*. at pp. 953-955.) No such errors occurred here. Mother has not discussed it at all, and neither will we in any detail.

To the extent the parties have alluded to other errors that occurred (for example, in noticing the relatives of their rights to participate in the case, or the delays in conducting and completing an assessment of Aunt Tracie), mother fails to demonstrate such errors had any impact on the termination of parental rights, or the placement of the children with non-relatives. Moreover, as to the placement issue, as discussed above, the juvenile court in the end concluded (after a five-day evidentiary hearing) that Aunt Tracie would not be able to protect the children from father, and we have upheld that finding on appeal.

In the parents' reply briefs, new arguments are made. Mother reframes the claim of cumulative error as a due process violation, and both parents cite due process caselaw (see *Lassiter v. Dept. of Social Services* (1981) 452 U.S. 18 [addressing indigent parent's right to counsel in dependency proceedings]; *In re Marriage of Carlsson* (2008) 163 Cal.App.4th

281, 294 [arbitrarily cutting off presentation of evidence rendered trial fundamentally unfair]). Mother also asserts the juvenile court should have declared a mistrial and "solicit[ed] accurate information as to the relatives before proceeding with the section 366.26 hearing." We will not consider these points because "[c]ourts will ordinarily treat the appellant's failure to raise an issue in his or her opening brief as a waiver of that challenge." (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685.) In addition, there is no effort to explain how the cited authorities support this claim of error, and "it is not the role of an appellate court to carry appellate counsel's burden" of demonstrating error. (*In re S.C.* (2006) 138 Cal.App.4th 396, 412.)

For these reasons, reversal is not warranted for cumulative error.

## V.

### *Conditional Reversal of the Order Terminating Parental Rights for ICWA Error Is Concededly Required.*

Finally, father argues the order terminating parental rights must be conditionally reversed because the trial court failed to ensure compliance with the ICWA (25 U.S.C. § 1901 et seq.). with respect to the Creek tribe. He asks for a limited remand with instructions to inquire further about father's Native American heritage and ensure proper ICWA notification to Creek tribes. The agency concedes this issue, and the concession is appropriate.

The agency was apprised by Aunt Tracie on April 5, 2019, that the family had "Creek" ancestry on their maternal side (through a great-grandfather). This disclosure "unquestionably provided reason to believe Indian children might be involved in these dependency proceedings and triggered the Department's duty to make further inquiry, as mandated by section 224.2, subdivision (e)." (*In re T.G.* (2020) 58 Cal.App.5th 275, 292; see generally *In re M.W.* (2020) 49 Cal.App.5th 1034, 1041-1044 [summarizing

64

the inquiry and notice requirements of federal law and California law, as amended effective January 1, 2019].)  Yet there is no evidence any further inquiry was made about that (see §224.2, subd. (e)), or that any Creek tribes were ever notified.  The agency's failure to make further inquiry requires conditional reversal of the orders terminating parental rights for an adequate investigation of the children's Indian ancestry relating to the Creek tribe. (See *In re T.G.*, at p. 292.)

## DISPOSITION

The orders denying father's and Aunt Tracie's petitions pursuant to section 388 are affirmed.  The orders terminating parental rights are conditionally reversed.  The matters are remanded to the juvenile court for full compliance with the inquiry and notice provisions of ICWA and related California law.

 

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

*In re Michael S.* (A158215, A158844, A159775)